Filed 04/30/13  P. v. Roe CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>KARL WINSTED ROE,<br><br>        Defendant and Appellant. | A134050<br><br>(Sonoma County<br>Super. Ct. No. SCR580490) |

After a negotiated disposition of a 13 count information, Karl Winsted Roe made a so-called *Romero* motion (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497), requesting that the court exercise its discretion to dismiss two prior strike allegations in the furtherance of justice under Penal Code section 1385.[1]  The court dismissed one prior but decline to dismiss the second, and Roe appeals the denial.  We uphold it, and affirm the judgment.

### BACKGROUND

Roe pled no contest to five of the 13 charges, but because his *Harvey* waiver (*People v. Harvey* (1979) 25 Cal.3d 754) allowed consideration of the dismissed counts at sentencing, we summarize all crimes as charged, and as shown by a presentence report and the preliminary examination.

---

[1]  All further section references, unless otherwise specified, are to the Penal Code.

1

## *Offenses and Plea*

The offenses, all felonies but one and allegedly occurring on or about April 5, 2010,[2] came to light or took place when sheriff's deputies investigating a rash of similar burglaries in the Healdsburg area encountered Desider Wiegand on Chalk Hill Road driving a stolen blue Honda Accord (with a rear license plate from an Acura), arrested him and, later that day, in investigating a stolen Honda Ridgeline truck found at a Santa Rosa mobile home park where Roe lived, apprehended Roe, after a chase, when he left in the truck.

Count IX, concerning the Accord, charged Roe with buying and receiving a vehicle he knew was stolen (§ 496d, subd. (a)). Owner Lisa Owens had reported it stolen from in front of her house on Randon Way during the night or early morning of March 15. After Wiegand was apprehended in the car on April 5, he cooperated with sheriff's deputies, telling them that Roe was in the Chalk Hill Road area that night and had met him that morning in Windsor, where Roe drove them back in the Accord. Wiegand denied committing any burglaries himself, but testified that he drove Roe from there, dropping him off outside houses at various locations in the Chalk Hill Road area and picking him up. He said Roe also drove the Accord again later that morning.

Counts I through III involved victim John Dennison, the owner of the Ridgeline truck. They charged burglary of his residence (§ 459), unlawful taking or driving of the vehicle (Veh. Code, § 10851, subd. (a)), and buying or receiving a vehicle known to be stolen (§ 496d, subd. (a)). The Chalk Hill Road residence of John and Carol Dennison had been entered and ransacked sometime between 7:30 and 11:00 a.m. on April 5, while they were out. Property taken included $10,000 worth of jewelry, and the truck was missing from an attached garage, the evident point of entry. After Roe was apprehended in the truck later that day, the Dennisons identified property in it as taken from the home.

Counts X and XI charged felony commercial burglaries (§ 459), that same day, of two unoccupied rental houses at Lancaster Estate Vineyards Winery, also on Chalk Hill

---

[2] All unspecified dates are in 2010.

Road.  A housekeeper discovered the break-ins around 9:00 a.m. and reported cable boxes and televisions sets missing.  Wiegand admitted driving Roe from the property in the Accord with the television sets, then driving him to a field off the road where they stashed that and other loot.  Wiegand took deputies to the field, where the televisions and other loot were recovered.  The Accord contained other property identified as taken from the rental houses.

Count VIII charged Roe with buying or receiving stolen guitars and other music paraphernalia (§ 496, subd. (a)).  Those items, found in a search of his bedroom days after his arrest, belonged to Nash Webber and Brian Laniel and had been stolen in a March 10 break-in and ransacking of Webber's home.

Wiegand was charged in several of the same crimes as Roe but "pled out," was on probation by the time of the preliminary examination, and testified under immunity granted at the People's request (§ 1324).  He described Roe as a prolific burglar, said he helped Roe pawn property from time to time, and said Roe had carried a Colt .45 handgun in an effort to burglarize a home on Todd Road (aborted when a woman appeared) and sometimes had an M-1 rifle.  Roe told Wiegand he was a " 'two striker' " and would do anything to avoid returning to prison, including shooting at police or killing others.  "He wasn't going to go out without taking a couple with him," Wiegand explained.

Counts IV through VII evidently reflect some of that desperation and arise from Roe's efforts to resist apprehension on April 5.  The charges are assault with a deadly instrument and force likely to produce great bodily injury on peace officer Brandon Austin (§ 245, subd. (c)), using a vehicle to evade a pursuing officer (Veh. Code, § 2800.2), using threats or violence to resist or deter peace officers Austin and Sal Borroso (§ 69), and resisting arrest by those officers (§ 148, subd. (a)(1)).  Detectives were staking out the mobile home park where the Ridgeline was seen parked when Roe emerged from his residence, got into the Ridgeline, and started to drive off.  Austin, dressed in jeans and a raid jersey bearing four-inch "sheriff's lettering" front and back, had just left his own vehicle and hitched a ride into the park on a UPS truck, meaning to

3

do surveillance. When he saw Roe slowly driving toward the park entrance, he jumped out of the truck with his gun drawn and, standing between the truck and the Ridgeline, identified himself and ordered Roe to stop. Roe, whose window was open, made a hard right turn and accelerated in an arc toward Austin, who had to step out of the way to avoid being hit as Roe proceeded past him and back toward the exit. Detectives Borruso and Moriarty were there in a GMC truck and SUV without sheriff's logos but with light bars and emergency lights. Borruso tried to block Roe's exit, but Roe maneuvered around him and out of the park, onto East Robles Avenue. Borruso and Moriarty pursued, with lights and sirens on, and Austin got back into his own unmarked vehicle and followed, also with equipment activated.

The pursuit continued onto Santa Rosa and Yolanda Avenues, with Roe running red lights and reaching speeds up to 70 mph in a 35 mph zone, driving on roadway shoulders and into oncoming traffic lanes, forcing cars off the road. Then Roe veered onto a dirt road to a farm, crossed a ditch, drove out around a barn and vineyard, abandoned the Ridgeline, ran, and tried to hide crouched down next to a camper shell. Borruso was first on the scene and, as other deputies caught up, drew his weapon and tried to get Roe to show his hands, but had to get on top of him and still could not handcuff him until he had assistance from a canine unit.

Counts XII and XIII charged possession by a felon of a .45-caliber handgun (former § 12021, subd. (a), recodified at § 29800, subd. (a)) and of ammunition (former § 12316, subd. (b)(1), recodified at § 30305, subd. (a)). These related to Wiegand's account of Roe possessing firearms and ammunition, and Roe admitted, in a post-arrest statement, possessing a firearm within the previous couple of weeks.

Prior convictions were charged as, among other things, serious felony (§ 667, subd. (a)(1)) and prison term (§ 667.5, subd. (b)) enhancements, and two first degree burglaries, from 1999 and 2004, were charged as prior strikes under the three strikes law (§ 1170.12).

In plea-change proceedings on July 1, 2011, Roe pled no contest to the Dennison burglary (count I; § 459), the aggravated assault on Detective Austin (count IV; § 245,

subd. (c)), the receipt of stolen property—the Owens Honda Accord (count IX; § 496d, subd. (a)), one of the vineyard guest house burglaries (second degree) (count X; § 459), and being a felon in possession of the Colt .45 firearm (count XII; § former § 12021, subd. (a)(1)). He also admitted the two prior strikes, and some other enhancing allegations not pertinent to this appeal. The plea was open, with no indicated sentence. A maximum exposure stated at the time of the plea to be 39 years and four months to life was in error but later amended, at sentencing, to a determinate five years plus an indeterminate 125 years to life, at which time Roe reaffirmed his pleas.

### *Presentence Report*

The presentence report details Roe's background and criminal history. Age 43 at sentencing, unmarried, and with only a sporadic history of gainful legal employment, he reported using cocaine as a teen, then moving to methamphetamine, which he used daily as an adult, except when in custody. He had a profligate record of drug- and theft-related crimes and arrests, failures on probation and parole, and failed drug treatment efforts.

Roe's criminal history starts with a 1992 petty theft arrest, at age 24, and continues largely unabated, except during times in custody, until the current offenses. He "was first granted a conditional sentence in 1993 following a conviction for [petty theft]. While subject to that grant, [he] sustained six new law violations, including multiple felonies that resulted in a CRC [(California Rehabilitation Center)] commitment. He was granted a second conditional sentence in 1993 following a [theft] conviction in Solano County[, then] sustained four new law violations." Felony convictions for auto theft and forgery resulted when Roe was apprehended at a bank to which he had driven a stolen car and tried to withdraw $500 and then forge a $500 check under the name "C. Bruce Solomon," possessed of checks and numerous credit cards in that name.

Then, after another petty theft conviction, came a grant of formal probation, but Roe failed to surrender for a six-month jail term. He was "arrested [on a bench warrant] in Orange County a few weeks later and transported to the Sonoma County Jail. While awaiting sentencing on the probation violation, Roe escaped from the North County Detention Facility. He was re-arrested shortly thereafter, pled guilty to misdemeanor

5

escape and was ordered to serve an additional 75 days in jail. Formal probation was reinstated, but while serving consecutive jail terms, Roe again escaped, by walking away from a work crew. When re-arrested, he was convicted of [a felony] escape charge and two new felony offenses. Probation was revoked and Roe was [again] committed to CRC." Early in that sequence came a 1993 misdemeanor conviction for drug possession, and the new felony convictions, in April 1994, were for drug possession and receiving stolen property.

Roe "was first released from CRC on outpatient status on 08/01/95. He initially found employment and abstained from drug use, but then absconded and was arrested for new felony offenses. Despite the parole agent's recommendation [that he] be committed to CDCR [(California Department of Corrections and Rehabilitation)], Roe was again committed to CRC. Roe was later released on outpatient status, with a special condition that he enter and complete a residential treatment program at the direction of the parole agent. Roe was paroled to the Victory Outreach program in Santa Rosa, and although he was informed the program was Christian based, within two days Roe asked to leave the program and enter another due to his difficulty with the religious aspect of the treatment. Roe was allowed to leave Victory Outreach if he cooperated with an outpatient program until being placed in another residential program. Roe missed his first intake interview for a new program, failed to chemical test, missed two counseling sessions, and later submitted a positive test for methamphetamine. On 06/30/98, Roe was arrested by his parole agent. Although [a] residential burglary [in a case yet to be filed] had occurred earlier that same day, at the time, the parole agent was unaware of the new criminal offense. Based on [Roe's] use of methamphetamine, failure to test and failure to follow directions, he was found in violation of parole and transported back to San Quentin, in route to CRC. On 03/08/99, [he] received a CDCR commitment [in the new burglary case]. Subsequently, on 03/11/99, he was discharged from the Civil Addict program in his other cases, and subsequently paroled from CDCR on 12/03/01."

Just two months into his parole, "Roe tested positive for methamphetamine, but his parole agent [recommended] that he be continued on parole. Roe was referred to the

6

BASN program for outpatient treatment. He was screened and had an intake appointment at the Orenda Center scheduled, but, shortly thereafter, he admitted smoking marijuana. Additionally, Roe changed jobs without notifying his parole agent, and was not living at his last reported address. Roe was arrested for a violation of parole; however, he was not found in violation, and was released to the community after a 'dry out' in custody. [He] was arrested two weeks later on a new [drug-related] felony offense[], and he received time in custody for the violation of parole. [His] parole agent felt that [Roe] was 'pretty sophisticated' and she suspected that he was 'trying to avoid another prison commitment' with his plea for treatment. [She] noted that while on parole, [he] was offered residential treatment options, but he was 'not interested.' "

"As a result of [another new residential burglary], [Roe] sustained another parole violation. [Roe] received an 11-month term based on his refusal to submit to chemical testing, use of methamphetamine on two separate occasions, and actions in that offense." His parole agent described him as "a sophisticated criminal."

"In 2002, [Roe] was again granted formal probation, [this time for] a felony drug conviction. [He] was also on state parole at the time and received a parole violation term of nine months. [He] was ordered to attend a residential treatment program but was inadvertently released from County Jail upon completion of his parole violation term. [He] was then released to TASC [(Treatment Alternatives for Safer Communities)] to participate in the Turning Point nine-month residential treatment program. Roe stayed at Turning Point for 27 days before leaving without permission. [He] failed to contact TASC or Probation and absconded supervision; a bench warrant was issued for his arrest, and [he] ultimately self-surrendered to Probation on 12/04/02. As a result, Roe received a nine month County Jail sentence, with probation to terminate upon his release."

In April 2004, in a negotiated plea, Roe was convicted of felony first degree burglary and admitted a five-year, prior-felony enhancement (§ 667, subd. (a)(1)). He was sentenced that June to CDCR for an 11-year term. The report explains: "Count III. [Roe] burglarized the victim's home by breaking a glass panel in the front door and forcing entry. He ransacked areas of the home, opening drawers and leaving items on the

7

floor. [He] stole jewelry that belonged to the victim's deceased wife, coins, a brass plate, and identification information. Harvey Waiver Counts I and II: [Roe] burglarized the victim's house through an unlocked door. He stole her purse, which contained her wallet, Palm Pilot, checkbook, disabled person parking pass, keys and other items. [Roe] also burglarized a car parked in the garage, stealing a stereo and other items. He left by stealing another of the victim's cars that was parked outside. It was later discovered [that] over $500 in unauthorized charges were made to the victim's credit cards. Harvey Waiver Count IV: Officers found several areas where the defendant attempted to enter the victim's house. There were pry marks on a door, two window screens were on the ground, a latter [*sic*] was by a window, and [the] window was shattered. This last attempted entry apparently activated an alarm system and caused [him] to flee."

Roe spent over five years in prison on that commitment, was paroled on October 24, 2009, and committed the current offense within six months of release. In a statement given to the probation officer for the report, Roe said he abstained from methamphetamine use for five months this time but, for about the last month, used it daily. He said he was mostly unemployed but "worked 'under the table' for 'a few weeks' as a landscaper," earning $10 per hour. He lived otherwise on general assistance ($175) and food stamps ($200), to offset a reported "$930 in fixed monthly expenses." He expressed remorse and a need for a drug treatment program. Asked why he kept committing residential burglaries, he wrote, " 'I think it's because it's what I've known; it's how I make money . . . I go back to what I know.' " He explained: " 'I really need a program' and . . . 'going to prison hasn't done anything for me.' . . . 'You would think after six years [in prison] I would get out and want to go straight. I did try to go straight. But I always go back to the same thing I've always done . . . I need a long term program to change . . . I'm still young enough to change my life. I don't want to live like that. I desperately want to change my life . . . . [My criminal behavior] is because of my drug use. I don't want to hurt anyone. I just get caught up [in past behavior].' " He reported attending "12-step meetings in custody" and wanted to attend "behavior modification" treatment at Delancey Street, saying he understood that his " 'life was a wreck.' "

8

His account of his current offenses, however, backtracked from his no contest pleas and prior statements, casting the blame on Wiegand.  He denied direct involvement in the burglaries, said he only drove for Wiegand, never entered the residences, took a car from one because " 'I was told to,' " and " 'pled guilty' to residential burglary 'because that's what they told me to plead guilty to.' "  He denied trying to strike or drive into an officer, saying he was in a stolen car high on methamphetamine, " '[c]onfused' " when someone stepped out of a UPS van and told him to " 'freeze,' " accelerated away, and did not realize it was an officer.  He said he did not hear sirens or realize he was "being detained until he drove into a field, got out of the car, and ran 30 feet"; then he saw police cars and lay down to surrender, never trying to resist or hide by the camper shell.  He also "denied possessing a gun during the offense, or at any time in the past," saying Wiegand must have made that up.  It was Wiegand, rather, who "possessed and sold stolen guns."  " 'I never carried a gun,' " Roe stated, " 'ever.' "

The report writer took a dim view of Roe's rehabilitation prospects, noting his claimed desire to reform and address his drug problem, but also the minimizing of his criminal behavior contrary to earlier admissions, for example, of burglarizing the Dennison residence and using Wiegand as an accomplice:  "Regardless of the setting where he resides, Mr. Roe, will need to honestly reflect on his actions if he is to address his antisocial behavior and gain any insight into his conduct"; "Regardless of the strike convictions at the time of sentencing, Mr. Roe has engaged in a pattern of escalating serious criminal conduct and that poses too great a risk to the community to warrant being supervised on probation."

### *"Romero" Motion*

Against his intractable criminal past, Roe's *Romero* motion argued that there were mitigating factors and stressed his desire to reform himself, attendance of 12-step classes while in custody, a letter of acceptance to Delancey Street, and a recommendation letter from a worker at TASC."  The letter from Delancey Street recounted an intake interview with Roe and his tentative acceptance into a program that required a two-year commitment:  "We realize this is a risk and offer no guarantees.  However, he did express

9

a sincere desire to make some changes and we are willing to help. Delancey Street tentatively accepts Karl, pending any unknowns found during the final interview at our facility the day of entry." The TASC letter, from a case manager, related that Roe had been screened and "accepted for participation," admitted having a substance abuse disorder, and "expressed a desire for rehabilitation." It stated, "Karl Roe will enter treatment at the earliest possible date, and TASC will keep the Probation Department notified of treatment progress or non-compliance." Letters from Roe asserted his feelings of responsibility for his actions, acknowledged past "denial over my actions and addiction," and asserted a desire to reform.

Also offered was a certification for outstanding classroom participation in "EARTH HOPE," the nature of which class is not revealed in the record but which the parties agree, based on a website, was focused on developing nonviolent relationships. There were also letters from Roe's parents, and another supporter, urging leniency.

The People opposed the *Romero* motion, arguing that granting it would be an abuse of discretion. At the sentencing on December 9, 2011, the prosecutor stressed that Roe had six opportunities to address his drug addiction, in CRC and probation, "each time to no avail," and had admitted the charges until his interview for the presentence report.[3] The prosecutor added: "Even if a drug rehabilitation would be available to Mr. Roe now, he's not ready. His life is not in a place where he's ready to take responsibility for that because he's still not being truthful with both the probation department and the Court, and most importantly, himself regarding the extent of his drug addiction and the risk he presents to public safety." The prosecutor, reacting to the

---

[3] "Mr. Roe admitted to Detective King, 'I robbed the place. It was my decision to walk into the house. We just went in and started separating the place.' . . . 'I was inside that house for 10 to 15 minutes[.]" [R]egarding the [section] 2800 evading the police that happened after those residential burglaries[, he] admitted to Detective Moriarty, 'I heard you behind me. I knew that you were behind me chasing after me.' Mr. Roe is making admission[s] to Detective King and Detective Moriarty, but he now denies all of this conduct to both the Court and probation department in the [report]."

court's announced tentative decision to dismiss just one strike, formally objected to striking either of Roe's prior strikes.

Roe's counsel argued the essence of the *Romero* motion, adding, in evident support of Roe's new denials of criminal involvement, that Wiegand was the source of the charges against Roe, that Wiegand's accounts would not have held up in a jury trial, and that Roe was under the influence when he made self-incriminating statements. Roe then testified briefly. Without referring to or retracting any of his interview denials, he vaguely said he was sorry for his "actions in 2010," took "full responsibility," apologized to the victims for his "actions on that day." And while acknowledging he had a "behavior problem" and was "not blaming it all on drugs," he said he wanted to change his life and get "the treatment that I need."

The sentencing judge felt conversant with the preliminary examination testimony, having presided at that hearing, and the prosecutor responded to defense argument by highlighting testimony that Roe cranked his steering wheel toward Detective Austin, who had to leap out of the way, and noting that Wiegand was not the sole source for the gun possession: "Mr. Roe admitted to Detective King himself, 'I've taken care of the guns a couple of [] nights ago. I crossed them for money,' and . . . alluded to crossed [as] giving the guns to a member of the Hell's Angels for money."

### *Ruling*

The court ruled: "As I've indicated on the current set of circumstances, the exposure to Mr. Roe is five years plus 125 years to life, and in this case it appears to me that Mr. Roe made substantial strides toward rehabilitation as evidenced by all of the documents supplied to the Court and as referenced by both attorneys, thus far.

"It also appears that the defendant falls to some extent outside the l[e]tter of the spirit of the three strikes law to the extent of striking one prior strike conviction. In this regard, I note that the defendant was suffering from a serious drug addiction at the time of the particular crimes[,] which addiction is now being addressed by the defendant. I've also taken in the path in that regard, although not necessarily directly applicable to this situation, California Rule[s] of Court[, rule] 4.013(c)(2)(b) [*sic*] in that the crimes appear

11

to have been committed because of [a] mental condition not amounting to a defense, and there's a high likelihood that the defendant would respond favorably to treatment that could be required of him. In other words, I think he's headed in the right direction.

"I also note that the defendant has expressed remorse [o]n more than one occasion for his criminal activity which is at issue at this time. I note the lack of any personal [in]fliction of bodily injuries in this particular case, and I note that the defendant acknowledged wrongdoing early in this prosecution.

"I also note that the present offenses are nonviolence to a great degree, and are not necessarily escalating his conduct overall. Perhaps for one onus [*sic*] exception to that is the violation of [section 245, subdivision (c)] as set forth in Count 4.

"I have personally considered the defendant's background, character, and prospects, and it appears to this court that it would be in the interest of justice, society, and to the defendant to strike one prior strike conviction . . . . As such, I am ordering stricken [his] prior strike conviction for the crime of first degree burglary in the violation of [] section 459 in Sonoma County case SCR-27658 . . . in March of 1999. This strike is stricken pursuant to Penal Code section 1385, and this strike conviction is stricken for purposes of imposing the current sentence in this case only and not for any other reason. Now, turning to the proposed sentence in this case, I am anticipating a sentence as to each of the five counts to which the defendant entered a [no contest] plea. The sentence would be consecutive on each and all of the counts, and the sentence would include a single status enhancement under [] section 667(a)(1) for a total of 24 years and four months in state prison."

The court ultimately imposed the anticipated sentence, less credits, and ordered remaining counts dismissed with the *Harvey* waiver.

### DISCUSSION

Refusal to dismiss or "strike" a prior conviction allegation under section 1385 is appealable (*People v. Carmony* (2004) 33 Cal.4th 367, 376 (*Carmony*)), and reviewed for abuse of discretion (*id.* at p. 375). "In [that review], we are guided by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that

12

the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' [Citations.] Second, a ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' [Citations.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it.

"Because 'all discretionary authority is contextual' [citation], we cannot determine whether a trial court has acted irrationally or arbitrarily . . . without considering the legal principles and policies that should have guided the court's actions. . . .

" '[T]he Three Strikes initiative, as well as the legislative act embodying its terms, was intended to restrict courts' discretion in sentencing repeat offenders.' [Citation.] To achieve this end, 'the Three Strikes law does not offer a discretionary sentencing choice, as do other sentencing laws, but establishes a sentencing requirement to be applied in every case where the defendant has at least one qualifying strike, unless the sentencing court "conclud[es] that an exception to the scheme should be made because, for articulable reasons which can withstand scrutiny for abuse, this defendant should be treated as though he actually fell outside the Three Strikes scheme." ' [Citation.]" (*Carmony*, *supra*, 33 Cal.4th at pp. 376-377.)

"Thus the three strikes law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so. In doing so, the law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*Carmony*, *supra*, 33 Cal.4th at p. 378.) "Where the record is silent [citation], or '[w]here the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instances' [citation]. Because

13

the circumstances must be 'extraordinary . . . by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack' [citation], the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary." (*Ibid.*)

The most extraordinary thing about this record is that the court struck the one prior that it did. The Attorney General has declined to build on the objection of the prosecutor below and claim abuse of discretion in that regard, but aptly calls the ruling "generous" in light of Roe's career of crime broken only by periods of incarceration, numerous failed chances to deal seriously with his drug problem and, as this record now demonstrates, willingness to use violence against peace officers to avoid apprehension on any new offense that he knew, as a second-striker, would bring a life term under the three strikes scheme. "The only way the court could have abused its discretion," the People suggest, "would have been to dismiss both strikes." We need not decide that hypothetical question, of course, but readily agree that there was no abuse of discretion in dismissing just one of Roe's two prior strikes.

We start by rejecting Roe's view, repeated here from below, that "the facts underlying the assault conviction were weak because the officer who had suddenly jumped out of the UPS truck with gun drawn as appellant drove by, 'was not in traditional law enforcement attire but rather was wearing a jersey with a sheriff logo [and] a badge around his neck.' " Our review is deferential, and we see no indication that the sentencing court embraced that view of the evidence or, for that matter, defense arguments that Wiegand's incriminating accounts could not be trusted, or that Roe was too high on methamphetamine to appreciate what was going on. In fact, faced with silence from the sentencing court on those matters, we presume, in support of its ruling *not* to dismiss both counts, that the judge implicitly *rejected* those arguments. Also, as the court also presumably realized, Roe's violence on this record is not limited to assaulting Detective Austin with the Ridgeline truck. Roe also used the truck to lead

14

officers on a dangerous chase through traffic in which he grossly exceeded the speed limit, twice ran red lights, and drove into oncoming lanes, forcing other drivers to evade him and even run off the road.

Roe stresses repeatedly that the court, referring to his having made "substantial strides" toward rehabilitation addressing a "serious drug addiction," and drawing by analogy from a rule guiding whether a defendant's presumptive statutory ineligibility for probation might be overcome, expressly did find: "[T]he crimes appear to have been committed because of [a] mental condition not amounting to a defense, and there's a high likelihood that the defendant could respond favorably to treatment that could be required of him. In other words, I think he's headed in the right direction." (Echoing Cal. Rules of Court, rule 4.413(c)(2)(B).) Roe calls the finding "a vital one and the key to this case," but takes the finding out of context. The court had stated just before those words: "It . . . appears that the defendant falls *to some extent* outside the . . . spirit of the three strikes law *to the extent of striking one prior strike* conviction." (Emphasis added.)

Against that reserved assessment, Roe argues: "The court's finding of 'a high likelihood that the defendant would respond favorably to treatment' supported striking both strikes in this case. Because, as the trial court found, appellant is highly likely to respond to treatment that would eliminate the drug addiction at the root of his criminality, he must be deemed fully outside the spirit of the Three Strikes Law."

We disagree, and do so based on case law addressing situations where a court finds a defendant to be outside the spirit of the law for one aspect of punishment but not another. Our Supreme Court held in one such case, "[A] trial court in a Three Strikes case may exercise its discretion under section 1385, subdivision (a), so as to dismiss a prior conviction allegation with respect to one count, but not with respect to another" (*People v. Garcia* (1999) 20 Cal.4th 490, 503-504 (*Garcia*)), reasoning: "In *Williams* [(*People v. Williams* (1998) 17 Cal.4th 148)], we instructed trial courts to consider among other things, ' " 'individualized considerations' " ' [citation] 'such as the nature and circumstances of the defendant's present felonies' and his 'prospects.' [Citation.] In many cases, 'the nature and circumstances' of the various felonies described in different

counts will differ considerably. A court might therefore be justified in striking prior conviction allegations with respect to a relatively minor current felony, while considering those prior convictions with respect to a serious or violent current felony." (*Garcia*, *supra*, at p. 499.) Then, against argument by the Attorney General that such treatment lacked a principled basis where current offenses were for the same or similar crimes (*id.* at pp. 499-500), the court held: "We disagree. Even if the current offenses are virtually identical, a defendant's 'prospects' [citation] will differ greatly from one count to another because a Three Strikes sentence on one count will itself radically alter those prospects. Here, for example, once the trial court had sentenced defendant to a term of 30 years to life for [one] burglary, his 'prospects' for committing future burglaries diminished significantly." (*Id.* at p. 500.) The court added, in words particularly instructive to Roe's all-or-nothing argument: "[A] defendant's sentence is also a relevant consideration when deciding whether to strike a prior conviction allegation; in fact, it is the overarching consideration because the underlying purpose of striking prior conviction allegations is the avoidance of unjust sentences. . . . When a proper basis exists for a court to strike prior conviction allegations as to at least one current conviction, the law does not require the court to treat other current convictions with perfect symmetry if symmetrical treatment would result in an unjust sentence." (*Ibid.*)

We draw from that reasoning that, as in a decision to strike a prior allegation as to one count, but not another, deciding to strike one allegation, but not another, is a proper exercise of discretion given the disparate potential lengths of sentences. Here, striking one prior strike allegation reduced Roe's exposure from more than 125 years to life, to over 24 years to life, a change from an effective life-without-parole sentence to one that gave the 43-year-old Roe a reasonable prospect of freedom. By Roe's own calculation, striking his second prior strike allegation would have resulted in a determinate term of 14 years eight months, but we cannot say that no reasonable judge could have concluded that a term that low, for a person with Roe's prospects and 25-year criminal history, was not within the spirit of the three strikes law. Roe may have been on the right track to

16

rehabilitating himself, but had evidently also convinced judges of a similar resolve many times before, only to fail each time and resume conduct that endangered the public.

Abuse of discretion is not shown.

## DISPOSITION

The judgment is affirmed.

_____
Kline, P.J.

We concur:

_____
Haerle, J.

_____
Lambden, J.